Filed 6/30/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DARRELL ANDREW DELEOZ,<br><br>    Defendant and Appellant. | H047775<br>(Santa Clara County<br> Super. Ct. No. C1520120) |

A jury convicted Darrell Andrew Deleoz of involuntary manslaughter of his girlfriend, Jennifer Lee.  At trial, it was undisputed that Lee had died from the consequences of a skull fracture, but its cause was vigorously contested.  The medical examiner for Santa Clara County opined that Lee had been beaten to death.  The district attorney relied on the medical examiner's testimony in arguing to the jury that Deleoz beat Lee to death and thereby committed first degree murder.  A defense expert disagreed with the medical examiner's assessment and opined that the injuries suffered by Lee could be consistent with a ground-level fall.

At issue in this appeal are two confidential, internal memoranda written by the office of the district attorney that Deleoz contends should have been disclosed to the defense as relevant to impeachment of the medical examiner's trial testimony.  Before

trial, the defense received redacted copies of the memoranda and moved for an order to disclose the unredacted portions under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) and Penal Code section 1054.1.[1]  On appeal, Deleoz asks this court to conduct an in camera review of the documents to determine whether the trial court erred by denying the defense's request for disclosure of the unredacted memoranda.  The Attorney General does not oppose in camera review.  Furthermore, the Attorney General agrees with Deleoz's additional request to correct a typographical error in the abstract of judgment.

For the reasons explained below, we conclude that, although portions of the redacted memoranda qualify under the facts here as impeachment material under *Brady*, the failure to disclose them was not material to the outcome at trial.  Accordingly, no *Brady* violation occurred.  For similar reasons, we decide any failure to disclose evidence under section 1054.1 did not result in reversable error.  Consequently, we affirm the judgment.

## I.  FACTS AND PROCEDURAL BACKGROUND

*A. Procedural History*

In July 2017, the Santa Clara County District Attorney filed an information charging Deleoz with the murder of Lee.  (§ 187; count 1.)

The jury trial began in October 2019.  In an in limine motion, Deleoz moved the trial court to order the disclosure of impeachment information related to the medical examiner, Dr. Michelle Jorden.  Specifically, Deleoz requested unredacted copies of two internal memoranda prepared by the office of the district attorney discussing investigations in which Dr. Jorden had been involved and which had been provided to the defense before trial, heavily redacted.  The trial court denied the defense's request to disclose the unredacted portions of the memoranda, stating "I believe the redacted

---

[1] Unspecified statutory references are to the Penal Code.

2

portions constitute work product and are not *Brady* or exculpatory material."  We examine the trial court's ruling in more detail in our discussion, *post*.

In November 2019, a jury found Deleoz not guilty of first-degree murder, not guilty of the lesser-included offense of second-degree murder, and guilty of the lesser-included offense of involuntary manslaughter.

In January 2020, the trial court sentenced Deleoz to three years in prison and deemed the sentence satisfied based on time served.  Deleoz timely appealed.

*B. Evidence Presented at Trial*

The narrow claim presented on appeal, regarding Deleoz's federal constitutional and/or state statutory rights to disclosure of the unredacted memoranda, makes it unnecessary to recount all the trial evidence.  We nevertheless summarize those portions of the prosecution and defense evidence, including testimony of the medical experts, as context for our discussion of the issues on appeal.

1.  Prosecution Evidence

Deleoz and Lee began dating in late 2013 or early 2014, when they lived in Southern California.  In April 2015, they moved to San Jose.  Lee was 30 years old and worked as a nurse.

Lee's sister and friends knew that Lee and Deleoz had relationship problems.  Lee drank alcohol to excess.  Lee's sister, Sarah, had previously seen a bruise on Lee's wrist; Deleoz explained he had accidentally caused the bruise while trying to get Lee into a car to go home.  Another time, Deleoz called Sarah asking for help getting Lee home.  Sarah and her husband drove to Hollywood and found Lee sitting on the sidewalk, drunk, while Deleoz was in his car nearby.  Deleoz was embarrassed and apologized for asking them to come and help.

Lee's childhood friend Cindy Chong, who reconnected with Lee when she moved to San Jose, at one point noticed scratch marks on Lee's neck or arm as well as marks on Deleoz's neck or arm.  At a dinner with two other couples in July or August 2015, Lee

3

had taken a Benadryl before going out and seemed to be falling asleep at the table. Deleoz insisted on taking her home, though she wanted to stay with their friends to go to karaoke. Deleoz yanked her arm to pull her from the table. After Lee's death, her nursing supervisor found a domestic violence brochure in her locker at work.

On the night of September 11, 2015, Deleoz and Lee went to a restaurant with the same two couples who had attended the dinner in July or August 2015. Everyone ate and drank a lot. The mood shifted when Lee and Deleoz began bickering. At one point, Lee fell off her chair.[2] At another point, Deleoz slapped Lee on the buttocks. She did not like it and said things to anger him. Lee was crying. Lee and Deleoz left the restaurant first. Lee's friend Cindy was worried about Lee going home with Deleoz, because she had not seen it so tense between the couple before and because Deleoz appeared to be "fuming."

A resident of the apartment complex where Deleoz and Lee lived was walking his dog shortly after 10:00 p.m. when he saw the couple arguing as they entered the building. Several residents later that night heard shouting, arguing, and screaming.

The next morning, at 7:26 a.m., Deleoz called 911. Firefighters and paramedics arrived a few minutes later. Deleoz was distraught, asking " 'Did I do this?' " The first responders found Lee on her back in the kitchen with her head up against a cabinet. She was pale and cold to the touch and had no pulse. The first responders moved Lee's body away from the cabinet and saw blood underneath the back of her head. Lee had blood and vomit in her hair and blood near her face. Paramedics tried to resuscitate Lee using chest compressions and a defibrillator. They pronounced her dead three minutes after they arrived.

A police officer interviewed Deleoz at the apartment; the interview was recorded and played for the jury. A second police officer accompanied Deleoz into the hallway.

---

[2] One of the friends at the table that evening testified that Deleoz pushed Lee off her chair. He confronted Deleoz about it and Deleoz did not respond, angering the friend.

4

Deleoz sobbed intermittently and at one point spontaneously said, " 'I may have done this.' "

Crime scene investigators used a blood reagent to look for signs of "blood cleanup." The reagent showed presumptive positive for blood on the kitchen floor, small stains on the counter and refrigerator, and in the bathroom sink and tub. Investigators found a blood stain on a shoe and on Deleoz's shirt. DNA analysis showed that the blood found on the refrigerator and the shirt matched Lee, blood found in the bathroom matched Deleoz, and both Deleoz and Lee were possible contributors to DNA profiles in the blood found in the bathtub. The Fitbit Lee was wearing when she died registered movement up until 10:16 p.m., no movement until 12:09 a.m. when it recorded 10 steps, then no more movement.

Dr. Jorden, chief medical examiner and neuropathologist for Santa Clara County, performed the autopsy. Lee's external injuries included a deep scalp laceration measuring one-and-three-quarter inch by one-quarter inch, a bruise on her right temple, injuries in and around the right eye, and other bruises and abrasions including on the knee, hip, forearm, cheek, buttock, and neck. Lee's internal injuries included two lacerations on the liver, a posterior rib fracture, hemorrhage of the pancreas, and the skull injury. Dr. Jorden opined that, apart from one of the liver lacerations, Lee's internal injuries were caused by blunt trauma and were not consistent with injuries resulting from the performance of CPR.

Lee's internal head injuries included massive bleeding beneath the scalp, a skull fracture across the crown of the head, and bruising on the left frontal lobe. The skull fracture caused an arterial bleed, which over time compressed the brain downward, causing death. As compression of the brain occurred, possible symptoms would include snoring and vomiting. Dr. Jorden's neuropathology of the brain revealed diffused axonal injuries of the nerve cells, indicating severe traumatic brain injury involving multiple strikes and a rotational motion of the head. Dr. Jorden opined that the injuries were

5

caused by multiple blunt force head trauma and were consistent with those of a person who had been beaten to death. She concluded the manner of Lee's death was homicide. Dr. Jorden opined that Lee's injuries were not consistent with a ground-level fall for a person of that age.

On cross-examination, Dr. Jorden denied having described herself as an advocate for victims. She also denied getting angry at the police when they do not immediately accept her opinions or complaining that the police did not do their jobs. Dr. Jorden was familiar with two memoranda prepared by an assistant district attorney, one in 2012 and one in 2019, concerning other investigations. She stated that the memoranda reflected the opinions of the author, and she could not answer for his opinions about her. On redirect, Dr. Jorden explained that as a medical doctor, her patients are dead and she "use[s] [her] investigation in the autopsy to explain why they died."

2. Defense Evidence

Deleoz testified in his defense. He described his background, education, and employment, including his work in military intelligence and honorable discharge and his career at an investment firm.

Deleoz and Lee met in Las Vegas through mutual friends and quickly entered into a serious relationship. Deleoz moved to Los Angeles to be with her. During that time, Deleoz and Lee partied a lot. Lee loved to drink and would get "extremely happy" and animated but there were times when her drinking was "out of control" and could be shocking. Deleoz described several incidents, including the time he grabbed Lee by the wrist to pull her away from her friend's car, causing a bruise, because Lee did not want to let a friend leave the party, and the time he called Lee's sister Sarah to help get Lee home after she leapt out of his car twice while he was trying to take her home from a party in Hollywood. Lee would never believe Deleoz when he would tell her the things she did so he started to take pictures—not to mock her but to show how serious it had gotten.

6

Lee would promise to limit her drinking but eventually would slip back into excessive drinking.

In 2015, they moved to San Jose. Lee's drinking increased. On the evening they met Lee's friend Cindy and the others for dinner in July or August 2015, Lee had taken over-the-counter drugs beforehand to get more drunk. They drank more at the restaurant and Deleoz decided he had to get Lee home. She was "a wreck" but didn't want to go and began pulling the other way, and he had to grab her to get her to the car.

Deleoz testified that he and Lee would argue about her drinking, that it would make him drink less because he would have to take care of her, and she would say he was no fun anymore and treated her like a baby. He did not know why she had the domestic violence pamphlet in her locker at work.

On September 11, 2015, Deleoz and Lee had some drinks at their apartment before taking an Uber to the restaurant. There, they ate and drank more. Lee got drunk. She slipped and fell to the floor on the way to the bathroom and Deleoz immediately picked her up and helped her to the bathroom. They were not arguing. The slap on her buttocks was affectionate and they would do it as an "inside couple thing," not to hurt or objectify. At the table, Deleoz playfully nudged Lee, and she fell off her seat. He had not meant to push her with enough force to make her fall and had not known she was that drunk. He immediately helped her up.

When Deleoz and Lee got home, they blamed each other for having had an embarrassing night. They bickered while walking to the apartment. In the hallway, Lee stumbled and dropped her purse and some items fell out. Deleoz picked them up and "kind of threw" the purse back into Lee's hands and chastised her for being so drunk. Once inside, Lee threw the purse contents in Deleoz's face and cursed at him. She wanted to argue and pushed him a few times. He braced for another push but then she pulled him and they "fell fast." He fell on top of her and they hit heads. She did not

7

appear injured and he saw her trying to get back on her feet. She was "furious" and began yelling even more in Korean.

Once Lee started yelling in Korean, Deleoz knew to leave her alone. He went into the bedroom and fell asleep. He did not believe anything was wrong. He did not see blood or vomit. At some point during the night he woke and heard her snoring loudly. He thought Lee was sleeping on the couch.

When Deleoz woke the next morning, Lee was not on the couch. He found her face down on the kitchen floor. He rolled her over and tried to wake her. He quickly realized something was wrong and tried to revive her. He was hugging, kissing, and shaking her. He then ran back to the bedroom, got his phone and clothes, and called 911. Deleoz did not think to tell the officer who interviewed him about the fall because he did not think it was a major issue; he got up fine and she "wasn't screaming in pain" but was "alive and yelling." Deleoz never kicked, punched, or stomped on Lee. He never cleaned up any blood. He did not kill her.

Deleoz's cousin's husband, a San Francisco police officer, testified that he had known Deleoz since 2005 and had lived with him for about six months. He never saw Deleoz become violent or aggressive. He believed Deleoz to be truthful.

Dr. Katherine Raven, a forensic pathologist, reviewed the autopsy and neuropathology reports, autopsy photographs, and other materials in evidence. Based on all the evidence, Dr. Raven would not have assessed the manner of death a homicide and instead would have characterized it as "undetermined." She agreed with Dr. Jorden's conclusions that the cause of death was due to epidural hemorrhage from a skull fracture and that Lee would have survived several hours after suffering the skull fracture. But given the "one big area of hemorrhage" under the skull fracture line, Dr. Raven believed the injury, though consistent with multiple impacts, did not exclude a single impact as the cause. Dr. Jorden did not shave Lee's head to search for evidence of additional external impact sites, and the evidence shown was inconclusive as to multiple impacts.

8

According to Dr. Raven, the injuries could have been caused by a single, ground-level fall with the head turned slightly left, even in a person as young as Lee. The laceration on the back of Lee's head may have been caused by a separate impact not associated with the skull fracture, likely during a "terminal fall" before death. The other injuries found across Lee's body were likely caused by blunt force trauma but were not consistent with a beating. Many of the external injuries were "extremely subtle." Dr. Raven could not determine the age of the bruises. There was no evidence of multiple impacts to the face or head, which would be expected if someone was beaten to death.

Lee's external injuries were consistent with the types of falls experienced by an intoxicated person. The rib fracture, though less common, could have been suffered during a fall; it also could be caused by a single kick or a stomp, though there was no external evidence of such impact. The injuries to Lee's liver are "extremely common" following the administration of CPR by a layperson, and the scant amount of hemorrhage from those injuries suggests they occurred "at the very end where there was no blood flow." Dr. Raven did not see any injury to Lee's pancreas.

Dr. Jorden's autopsy report included a pathological diagnosis of "intimate partner violence." Dr. Raven would not have stated that information in the autopsy report, since intimate partner violence is not a medical diagnosis. Instead, there is a place on the death certificate where that information can be included.

In the prosecution's rebuttal case, Dr. Jorden testified that she has never seen a case where a healthy 30-year-old individual sustained the same kind of injuries suffered by Lee from a ground-level fall. It is possible that a fall where the left temple hit the floor could have caused Lee's skull fracture. Dr. Jorden explained that she included "intimate partner battery" in her autopsy report because her patients "are deceased" and "cannot speak."

9

## II.  DISCUSSION

Deleoz requests that this court conduct an independent, in camera examination of the unredacted memoranda concerning Dr. Jorden and determine whether the trial court's decision not to order further disclosure of the unredacted memoranda violated federal due process under *Brady* or was an abuse of discretion under section 1054.1.  The Attorney General agrees that this court may review in camera the confidential materials to determine whether additional portions should have been provided to the defense.  Deleoz also asks this court to order the trial court to correct an error in the abstract of judgment, and the Attorney General concurs.

### A.  *Impeachment Evidence Based Upon the Confidential Memoranda*

#### 1.  Additional Background

Before trial, Deleoz moved in limine for the trial court to order the disclosure of impeachment information related to Dr. Jorden.  Specifically, Deleoz requested the disclosure of all information in the prosecution's possession "that tends to show a bias on the part of Dr. Michelle Jorden, M.D., or detracts from her credibility in any way."  Deleoz sought the disclosure of 12 pages of internal memoranda written in October 2012 and January 2019 by the assistant district attorney.  In response to an earlier discovery request, defense counsel had received a redacted copy of the memoranda; the redacted memoranda revealed the partial contents of approximately three of the 12 pages.  The remaining nine pages were entirely redacted.

Deleoz argued, based upon the disclosed portions, that the memoranda appeared to describe "statements by Dr. Jorden evincing her bias, her complaints that police investigators were not pursuing criminal charges, and other concerns about her objectivity and credibility, including her own admission of her bias, to wit, that she sees herself as an advocate for the victim."  In his motion, Deleoz relied on the unredacted portions of the memoranda to assert that Dr. Jorden had "attempted to pursue a homicide finding where the police, based on their investigation, determined the death was the result

of an accident." Deleoz also pointed to statements in the 2012 memorandum regarding Dr. Jorden's expressions of disappointment with the police investigation in the case of the death of a young child and purported view of herself as an " 'advocate,' " which Deleoz argued was indicative of "a pro-prosecution bias."

Deleoz argued that the prosecutor had a federal constitutional duty to disclose the requested information under *Brady*, and a state statutory duty to do so under section 1054.1. The prosecutor filed written opposition asserting that the redacted portions of the memoranda did not contain *Brady* material, were protected by the work product privilege, and were not discoverable. The prosecutor explained that he provided Deleoz with a partially redacted copy of the memoranda based on what the trial court had previously determined in an unrelated case was not work product and had ordered released in that case. However, the prosecutor maintained that as to this case, even the unredacted portions provided to Deleoz were irrelevant and should be excluded from evidence at trial. The prosecutor also asserted that under section 1054.7, disclosure could be restricted or denied upon a showing of good cause, including the "possible compromise of other investigations by law enforcement." (See *People v. Suff* (2014) 58 Cal.4th 1013, 1059 (*Suff*).)

In ruling on the motion to disclose, the trial court noted the redacted memoranda were produced in another case over which it had presided, as a result of "extensive hearings about the unredacted memos and [this] court's determination that the redacted portions constituted work product." The court denied the defense's request to disclose the unredacted portions of the memoranda in this case, stating "I believe the redacted portions constitute work product and are not *Brady* or exculpatory material." The court received a lodged copy of the unredacted memoranda and placed it under seal for purposes of appellate review.

During trial, defense counsel cross-examined Dr. Jorden as described *ante*, including in reference to the memoranda. Dr. Jorden denied calling herself an "advocate

11

for the victims" or criticizing the police if they do not immediately accept her opinions. Dr. Jorden testified that the memoranda reflected the opinions of the assistant district attorney who authored them and that she could not answer for his opinions. Dr. Jorden later explained her position as a medical doctor whose patients are deceased and for whom she "use[s] [her] investigation in the autopsy to explain why they died."

In closing argument, the prosecutor acknowledged there was no direct evidence that showed Deleoz "beating Ms. Lee to death" but "plenty of circumstantial evidence." Referencing Dr. Jorden's autopsy report, the prosecutor asserted that "undoubtedly Ms. Lee was beat to death." Discussing Dr. Jorden's trial testimony, the prosecutor reminded the jury that "Dr. Jorden told you there was no doubt [Lee] suffered from multiple blows to the head. No doubt in her mind."

The prosecutor also discussed what he characterized as Deleoz's "story" in his trial testimony that Lee was accidentally injured during a fall. The prosecutor asked the jury, "How likely is it that a healthy 30-year-old fell to the ground to her death?" Answering his own rhetorical question, he asserted, "Dr. Jorden in Santa Clara County has told you 'never.' 'In our county? Never.' "

When discussing the jury's consideration of the testimony of conflicting experts, the prosecutor contrasted Dr. Jorden's qualifications and reputation to that of defense expert witness Dr. Raven. "Raven went to Reno medical school. Jorden went to Stanford Medical School. Jorden is the chief medical examiner in Santa Clara County. Raven was not. . . . [¶] . . . [¶] . . . [Raven is] an unpaid volunteer at UC Davis. [¶] Dr. Jorden still teaches at Stanford. [¶] . . . [¶] Dr. Jorden has to review each and every single autopsy in Santa Clara County. [¶] Who is the more qualified doctor to talk about a brain injury? One of 36 neuropathologists in the country or someone who pretends to be one."

In its closing argument, defense counsel suggested that Dr. Jorden displayed "confirmation bias" and jumped to conclusions. The defense argued that Dr. Jorden

12

"failed to gather important evidence before she rendered her opinion" because "she had her mind made up," made mistakes in the autopsy report that were not immediately corrected, included intimate partner violence as part of her pathological diagnosis despite that it is not a medical diagnosis, and gave "really confident" answers that showed "no gray area" and "no nuance."

### 2. Legal Principles and Standards of Review

The United States Supreme Court in *Brady* established that a criminal defendant has a federal due process right to pretrial discovery of material information favorable to his defense. (*Brady*, *supra*, 373 U.S. at p. 87.) The government's duty of disclosure encompasses both "exculpatory evidence that casts doubt on the defendant's guilt and impeaching evidence that calls into question the credibility of government witnesses." (*People v. Jimenez* (2019) 32 Cal.App.5th 409, 417; see *Strickler v. Greene* (1999) 527 U.S. 263, 280–282 (*Strickler*).) Evidence is material within the definition ascribed by the Supreme Court " 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " (*Strickler*, at p. 280.)

The United States Supreme Court has identified three components of a *Brady* violation: (1) the evidence at issue must be favorable to the accused because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) the defendant must have been prejudiced by the nondisclosure. (*Strickler*, *supra*, 527 U.S. at pp. 281–282.) "Prejudice" in the context of a potential *Brady* violation turns "on 'the materiality of the evidence to the issue of guilt and innocence.' " (*People v. Salazar* (2005) 35 Cal.4th 1031, 1043 (*Salazar*).)

To demonstrate materiality, a defendant " 'must show a "reasonable probability of a different result." ' " (*Salazar*, *supra*, 35 Cal.4th. at p. 1043.) "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial

13

resulting in a verdict worthy of confidence.  A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " (*Kyles v. Whitley* (1995) 514 U.S. 419, 434 (*Kyles*).)  "In determining whether evidence is material under this standard, we consider ' "the effect of the nondisclosure on defense investigations and trial strategies." ' " (*People v. Williams* (2013) 58 Cal.4th 197, 256 (*Williams*).)  Furthermore, "while the tendency and force of undisclosed evidence is evaluated item by item, its cumulative effect for purposes of materiality must be considered collectively." (*In re Brown* (1998) 17 Cal.4th 873, 887 (*Brown*).)

" ' "Because a constitutional violation occurs only if the suppressed evidence was material by these standards, a finding that *Brady* was not satisfied is reversible without need for further harmless-error review." ' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 668 (*Beck and Cruz*).)  On appeal, we independently review whether a *Brady* violation occurred, giving great weight to the trial court's findings of fact if they are supported by substantial evidence.  (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 176.)

In addition to the disclosure requirements arising under the federal due process clause, California's reciprocal discovery statute " 'independently requires the prosecution to disclose to the defense . . . certain categories of evidence "in the possession of the prosecuting attorney or [known by] the prosecuting attorney . . . to be in the possession of the investigating agencies." ' " (*Beck and Cruz*, *supra*, 8 Cal.5th at p. 668.)  As relevant here, section 1054.1 requires the prosecution to disclose "[a]ny exculpatory evidence" (§ 1054.1, subd. (e)), "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial," (*id.*, subd. (f)), and "[t]he existence of a felony conviction of any material witness whose credibility

14

is likely to be critical to the outcome of the trial." (*Id.*, subd. (d).)[3] It "requires the prosecution to provide all exculpatory evidence, not just evidence that is material under *Brady* and its progeny." (*People v. Cordova* (2015) 62 Cal.4th 104, 124 (*Cordova*).)

Privileged materials and certain attorney work product need not be disclosed under the statutory scheme. Section 1054.6 provides, "Neither the defendant nor the prosecuting attorney is required to disclose any materials or information which are work product as defined in subdivision (a) of Section 2018.030 of the Code of Civil Procedure, or which are privileged pursuant to an express statutory provision, or . . . as provided by the Constitution of the United States." (§ 1054.6.) Our Supreme Court has explained that in referring to Code of Civil Procedure section 2018.030, subdivision (a),[4] section 1054.6 " ' "expressly limits the definition of 'work product' in criminal cases to 'core' work product, that is, any writing reflecting 'an attorney's impressions, conclusions, opinions, or legal research or theories.' " ' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 355, italics omitted (*Zamudio*).) The statute also provides that disclosure under the reciprocal discovery framework may be "denied, restricted, or deferred" upon a showing

---

[3] Stated in full, section 1054.1 provides, "The prosecuting attorney shall disclose to the defendant or his or her attorney all of the following materials and information, if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies: [¶] (a) The names and addresses of persons the prosecutor intends to call as witnesses at trial. [¶] (b) Statements of all defendants. [¶] (c) All relevant real evidence seized or obtained as a part of the investigation of the offenses charged. [¶] (d) The existence of a felony conviction of any material witness whose credibility is likely to be critical to the outcome of the trial. [¶] (e) Any exculpatory evidence. [¶] (f) Relevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts made in conjunction with the case, including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the prosecutor intends to offer in evidence at the trial." (§ 1054.1.)
[4] Code of Civil Procedure section 2018.030, subdivision (a) states, "A writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories is not discoverable under any circumstances." (Code Civ. Proc., § 2018.030, subd. (a).)

15

of "good cause" under limited circumstances, including "possible compromise of other investigations by law enforcement." (§ 1054.7.)

We review the trial court's ruling denying disclosure of the unredacted memoranda under the abuse of discretion standard generally applicable to discovery motions. (See *People v. Elder* (2017) 11 Cal.App.5th 123, 131; *People v. Ayala* (2000) 23 Cal.4th 225, 299.) A violation of the reciprocal discovery obligations constitutes reversible error only where it is reasonably probable, by state-law standards, that the omission affected the trial result. (*People v. Verdugo* (2010) 50 Cal.4th 263, 280 (*Verdugo*); *People v. Zambrano* (2007) 41 Cal.4th 1082, 1135, fn. 13, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

### 3. Analysis

We first summarize our conclusions and then set out our analysis.

After independently reviewing the redacted and unredacted memoranda, we decide that the trial court did not abuse its discretion in denying Deleoz's discovery motion under state law based on work product (§ 1054.6) and the lack of exculpatory evidence (§ 1054.1, subd. (e)) in the memoranda. But we conclude the trial court should have evaluated certain statements attributed to Dr. Jorden for relevance to determine whether those statements were discoverable under section 1054.1, subdivision (f). Whether material must be disclosed under the criminal discovery statutes and the due process clause may turn on the facts of the case and thus requires case-specific assessments by the prosecutor and (if necessary) the trial court. The record in this case suggests that such case-specific analysis did not precede the trial court's ruling. Nevertheless, the failure to do so does not amount on this record to reversible error under state law.

Further, we determine that the nondisclosure of potential impeachment evidence did not violate Deleoz's federal right to due process under *Brady* under the facts of this case. It is apparent that the jury rejected Dr. Jorden's opinion that Lee had been beaten to

16

death, and it is not reasonably probable that additional evidence to support the defense's impeachment of Dr. Jorden would have altered the jury's verdict or led to an acquittal.

### a. Prosecution's Criminal-Discovery Obligation Under Section 1054.1

We begin our analysis under state law, which establishes that a criminal defendant's statutory right to discovery under section 1054.1 entitles the defendant to discovery of specified categories of evidence without having to show materiality as required to establish a violation under *Brady*. (See *Cordova*, *supra*, 62 Cal.4th at p. 124; *Barnett v. Superior Court* (2010) 50 Cal.4th 890, 901 (*Barnett*).)

The reciprocal discovery statute sets forth explicit categories for disclosure (§ 1054.1) while maintaining exceptions for attorney work product, privilege, and good cause (§§ 1054.6, 1054.7). Because the prosecution's duty to disclose "[a]ny exculpatory evidence" to the defense (§ 1054.1, subd. (e)) is not limited to evidence that is ultimately deemed to be material under the *Brady* standard, materiality is not determinative of the disclosure obligation under state law. In other words, the showing "to establish a violation of the prosecution's duty to disclose exculpatory evidence differs from the showing necessary merely to receive the evidence." (*Barnett*, *supra*, 50 Cal.4th at p. 901.) "[M]ateriality is relevant in considering a claimed discovery violation after the trial has occurred, but it does not govern the scope of the duty to disclose in the first place, which encompasses all exculpatory evidence." (*People v. Lewis* (2015) 240 Cal.App.4th 257, 266 (*Lewis*).)

Thus, Deleoz's entitlement to discovery of the unredacted memoranda under section 1054.1 hinges on whether the redacted information is subject to disclosure under one of its subdivisions, or whether it is excepted from disclosure because it consists of core attorney work product or is otherwise privileged (§§ 1054.6, 1054.7). Only if the information is discoverable, and is neither attorney work product nor privileged, need this court ascertain whether its nondisclosure was prejudicial. (See *Verdugo*, *supra*, 50 Cal.4th at p. 280.)

17

Deleoz submits he was entitled to the unredacted memoranda on two statutory grounds. He argues that any impeachment evidence, including but not limited to evidence of bias, qualifies as exculpatory under section 1054.1, subdivision (e). He also maintains that he should have received under section 1054.1, subdivision (f), " '[r]elevant written or recorded statements or reports of the statements of' " Dr. Jorden.

With respect to Deleoz's argument under section 1054.1, subdivision (f), we agree. That provision requires the prosecutor to disclose "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial." (§ 1054.1, subd. (f).) The Evidence Code defines " '[r]elevant evidence' " as "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) With respect to evaluating witness credibility, the Evidence Code states "the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to . . . [¶] . . . [¶] [t]he existence or nonexistence of a bias, interest, or other motive." (Evid. Code, § 780, subd. (f).) Therefore, to the extent that statements within redacted portions of the memoranda are relevant due to their potential impeachment value, they are discoverable under the plain terms of section 1054.1, subdivision (f).

It is less clear that impeachment evidence must be disclosed under section 1054.1, subdivision (e). Other appellate courts have noted that it "is not entirely apparent" whether the statutory text of section 1054.1, subdivision (e) encompasses impeachment evidence. (See *Kennedy v. Superior Court* (2006) 145 Cal.App.4th 359, 377 (*Kennedy*); *Lewis*, *supra*, 240 Cal.App.4th at p. 266.) In *Kennedy*, the court observed that although a broad reading of the term " 'exculpatory evidence' " might incorporate impeachment evidence in some circumstances, the terms "impeachment" and " 'exculpatory' "

18

evidence are used distinctly in the *Brady* context. (*Kennedy*, at p. 377.) Moreover, because section 1054.1 expressly identifies a specific category of impeachment evidence, namely, the existence of a felony conviction of any material witness whose credibility is likely to be critical at trial (§ 1054.1, subd. (d)), a broad reading of section 1054.1, subdivision (e), requiring the disclosure of exculpatory evidence to encompass all impeachment evidence, would render subdivision (d) superfluous—an outcome contrary to one of the basic tenets of statutory interpretation. (*Kennedy*, at p. 377.)

Deleoz does not address *Kennedy* or suggest how to reconcile a broad or inclusive reading of "exculpatory evidence" under section 1054.1, subdivision (e), with the other subdivisions. Based on the express enumeration of the subdivisions comprising materials and information subject to disclosure, we agree with *Kennedy*, as a textual matter, that it would be improper to construe "[a]ny exculpatory evidence" under section 1054.1, subdivision (e), as broadly encompassing all forms of impeachment evidence.[5]

The sealed memoranda, as Deleoz is aware based on the unredacted portions disclosed to him and utilized at trial, contain information provided by the assistant district attorney to the district attorney, initially in 2012 and supplementally in 2019, concerning Dr. Jorden's work as the assigned pathologist in several death investigations. Having conducted an in camera review of the unredacted memoranda, we decide the trial court did not abuse its discretion in denying Deleoz's discovery motion under state law based on work product (§ 1054.6) and the lack of exculpatory evidence (§ 1054.1, subd. (e)).

---

[5] While we accept the *Kennedy* court's analysis that section 1054.1, subdivision (e) does not broadly encompass all forms of impeachment evidence, we respectfully disagree with its treatment of impeachment evidence under *Brady*. (See *Kennedy*, *supra*, 145 Cal.App.4th at p. 377.) In *United States v. Bagley* (1985) 473 U.S. 667, 676 (*Bagley*), the United States Supreme Court explained that it had previously "rejected any such distinction between impeachment evidence and exculpatory evidence" (*ibid.*) and emphasized " '[w]hen the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within th[e] general rule [of *Brady*].' " (*Id.* at p. 677.)

19

To the extent the memoranda relate the assistant district attorney's impressions and opinions about Dr. Jorden's interactions with law enforcement and her evaluation of the evidence in those cases, those comments constitute core attorney work product and are excluded from discovery under section 1054.6. (*Zamudio*, *supra*, 43 Cal.4th at p. 355.) This category of work product "includes materials compiled by investigators and other agents in preparation for trial." (*People v. Superior Court* (*Jones*) (2019) 34 Cal.App.5th 75, 81, citing *People v. Collie* (1981) 30 Cal.3d 43, 59.) Because the assistant district attorney prepared the memoranda in the scope of his duties as the county's assistant prosecutor, incorporated the comments of law enforcement officers and Dr. Jorden concerning active investigations, and divulged his personal impressions and opinions concerning Dr. Jorden's work on those investigations, the redacted portions of the memoranda qualify, in those respects, under the statutory exception for core work product set forth in section 1054.6.[6]

The redacted portions of the memoranda are additionally composed of case-specific information related to the death investigations included in the memoranda. For example, the redacted information in the 2019 memorandum pertains primarily to two death investigations which were still pending when the first memorandum was drafted in 2012. The redacted material sets forth details of those cases in terms of the police investigation, witness statements, autopsy notes, and communications between Dr. Jorden

_____

[6] In its opposition to Deleoz's motion to order the disclosure of impeachment information, the prosecutor asserted that disclosure also could be denied or restricted, upon a showing of good cause, based on the public interest in preserving the confidentiality of information about ongoing investigations. (See § 1054.7.) The California Supreme Court has recognized that information pertaining to ongoing investigations may be subject to " 'the privilege for official information' " specified in Evidence Code section 1040, subdivision (b). (*Suff*, *supra*, 58 Cal.4th at p. 1059.) Because the trial court did not address the issue in its ruling on the motion for disclosure, and the parties do not argue it on appeal, we have no occasion to review the application of section 1054.7 to any portions of the redacted memoranda that concern active investigations.

and detectives as they pertained to the conclusions drawn in those cases regarding cause and manner of death. Apart from the introductory and concluding paragraphs in the 2012 and 2019 memoranda, which come almost entirely within the work product exception, the redacted death investigation summaries—including the entirely redacted death investigation summaries from the 2019 memorandum—are not exculpatory under section 1054.1, subdivision (e) because they do not tend to exonerate Deleoz from guilt. (See *J.E. v. Superior Court* (2014) 223 Cal.App.4th 1329, 1335.)

To the extent the memoranda demonstrate concern about Dr. Jorden's alleged tendency to "rush to judgment," that sentiment is captured by the unredacted portion of the 2012 memoranda that Deleoz obtained before trial and which he utilized in his cross-examination of Dr. Jorden.

There are, however, additional, nondisclosed portions of the memoranda which document Dr. Jorden's conclusions regarding the cause and manner of death in specified death investigations, including one case bearing some factual resemblance here (to the extent it considered whether the decedent may have sustained the fatal injury during a fall or had been killed by another person). Further, nondisclosed portions include statements attributed to Dr. Jorden that describe shifts in her classification of cause and manner of death with additional or changing information from the investigation and suggest some omissions in the information considered or included in her reports.

That material—liberally construed—and insofar as it takes the form of statements or reported statements by Dr. Jorden (§ 1054.1, subd. (f)) warranted an evaluation by the trial court for relevance as potential impeachment evidence related to Dr. Jorden's credibility as a witness or her objectivity as a pathologist. It appears from the record that the trial court did not consider whether this material should have been disclosed under section 1054.1, subdivision (f). Moreover, it appears the trial court may not have conducted a case-specific inquiry and relied solely on its prior analysis in a different case.

21

While the record is not entirely clear on these points, if true, they would constitute an abuse of discretion.

Nevertheless, even assuming (without deciding) that the trial court erred under section 1054.1, subdivision (f) in not ordering the prosecution to disclose one or more statements made by Dr. Jorden contained in the redacted portions of the memoranda, we decide it is not reasonably probable—for the reasons explained below in the context of our analysis under *Brady*—that the failure to disclose these statements affected the trial result. (*Verdugo*, *supra*, 50 Cal.4th at p. 280.) We therefore perceive no reversible error, under the harmless-error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836, in the trial court's decision to deny further disclosure of the redacted material in the memoranda on state statutory grounds.

### b. Prosecution's Disclosure Obligation Under *Brady*

We turn to whether the trial court erred in declining to order further disclosure of any portion of the unredacted memoranda as exculpatory or impeachment evidence favorable to the defendant under *Brady*. In contrast with the enumerated categories for disclosure under California's reciprocal discovery statute, the scope of the prosecution's duty under *Brady* and its progeny is broad, encompassing impeachment evidence as well as exculpatory evidence. (*Strickler*, *supra*, 527 U.S. at p. 281.) Even so, "not every violation of that duty necessarily establishes that the outcome was unjust." (*Ibid.*) Rather, the suppression of qualifying exculpatory or impeachment material gives rise to a " 'real *Brady* violation' " only where the nondisclosure was material, meaning "the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." (*Ibid.*)

We have already determined in our statutory analysis *ante* that those portions of the redacted memoranda comprising factual information about the death investigations described in the memoranda (including detective findings, witness statements, and details about the deceased) are not exculpatory as to Deleoz. We therefore focus our analysis on

22

those parts of the redacted memoranda that contain possible impeachment evidence with respect to the testimony of Dr. Jorden.

The first element of a *Brady* violation is whether the evidence at issue is "favorable to the accused, either because it is exculpatory, or because it is impeaching." (*Strickler*, *supra*, 527 U.S. at pp. 281–282.)  Deleoz contends that statements of Dr. Jorden reported in the memoranda that showed bias in the conduct of her duties qualified for disclosure because Dr. Jorden's expert opinion was critical to the jury's determination of guilt.

Case authority highlights the breadth of *Brady*'s favorability inquiry.  In *Salazar*, *supra*, 35 Cal.4th at p. 1035, the California Supreme Court considered the petitioner Salazar's *Brady* claim in a second-degree murder case where Salazar sought a copy of a follow-up investigation report in a separate case involving the same forensic pathologist, Dr. Ribe, who had testified at the petitioner's trial.  Salazar sought the disclosure of evidence that Dr. Ribe had altered his opinion as to the timeline of incapacitation and death in the unrelated case and argued the change in opinion showed bias because Dr. Ribe had relied on non-medical facts to support the new opinion.  (*Id*. at p. 1048.)  The Attorney General countered that the investigation report was not impeaching because Dr. Ribe had a legitimate basis for changing his opinion in the earlier case.  (*Ibid.*)  Our high court rejected the relevance of the Attorney General's argument to the first component under *Brady*.  The court explained that the Attorney General's "objection goes to the weight, not the character of the evidence as impeaching—or, in *Brady* terms, the Attorney General is really disputing whether the evidence is *material*, not whether it is *favorable*." (*Ibid.*)  The court thus concluded that Salazar had established the first element of his *Brady* claim based on Dr. Ribe's change in opinion.  (*Ibid.*)

In this case, like in *Salazar*, Deleoz sought evidence based on Dr. Jorden's work in other death investigations that could be used to support the defense's theory of bias, which was that (in the defense's view) Dr. Jorden tended to characterize as homicides

23

deaths that were in fact accidental and overlooked contrary evidence. What is more, while the limitations set forth in section 1054.1, subdivision (f) tie discoverability to statements or reported statements of a testifying witness, impeachment evidence under *Brady* is not so limited.

Under *Salazar*, a medical expert's opinion or conduct in an unrelated death investigation may be impeaching—and thus favorable in terms of *Brady*, even if it is ultimately deemed not to be material on appellate review. (*Salazar*, *supra*, 35 Cal.4th at p. 1050.) Applying that standard here, as described *ante*, there appear to be some statements in the redacted memoranda pertaining to opinions rendered by Dr. Jorden in other death investigations which the defense might have tried to use at trial to support Deleoz's efforts to impeach Dr. Jorden's credibility as a witness or objectivity as a pathologist by suggesting that she drew hasty conclusions, even if ultimately the evidentiary weight or value of the impeachment material would have been quite limited.

As the United States Supreme Court has observed, "the *Brady* rule's ' " overriding concern [is] with the justice of the finding of guilt," ' [citations], and that the Government's ' "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done[.]" ' [Citations.] Consistent with these principles, the Government assured the Court at oral argument that subsequent to petitioners' trial, it has adopted a 'generous policy of discovery' in criminal cases under which it discloses any 'information that a defendant might wish to use.' [Citation.] As we have recognized, and as the Government agrees, . . . '[t]his is as it should be.' " (*Turner v. United States* (2017) 582 U.S. __ __ 137 S.Ct. 1885, 1893 (*Turner*).)

Setting aside the redacted portions of the memoranda that comprise attorney work product, and the factual information pertaining to other investigations which we have deemed irrelevant to the determination of Deleoz's guilt or innocence in this case, we conclude that some material in the undisclosed portions of the memoranda was favorable to the defense in that it might have been used to impeach the credibility of Dr. Jordan's

24

conclusions. The identification prior to trial of "favorable" evidence under the first prong of *Brady* does not depend on a definitive determination of admissibility at trial. As expressed by the California Supreme Court, "the trial judge, not the prosecutor, is the arbiter of admissibility, and the prosecutor's *Brady* disclosure obligations cannot turn on the prosecutor's view of whether or how defense counsel might employ particular items of evidence at trial." (*In re Miranda* (2008) 43 Cal.4th 541, 577 (*Miranda*).)[7]

The accuracy of Dr. Jorden's conclusion that Lee had been beaten to death was central to the case against Deleoz. The prosecutor in closing argument emphasized Jorden's expertise, professional qualifications, and reputation. He highlighted the certainty and precision of her conclusions, while denigrating those of Deleoz's own expert.

Given the centrality of Dr. Jorden's findings to this investigation, certain portions of the memoranda, particularly those describing incidents with factual similarities to this case, could have had impeachment value for Deleoz's contentions that Dr. Jorden displayed confirmation bias, failed to gather key evidence before rendering her opinion, and did not consider potential alternative causes of death. Rather than evaluate the memoranda for potential impeachment evidence *in this case*, however, it appears from the record that both the prosecutor and the trial court may have relied on prior redactions carried out in another case in concluding the redacted material is "not *Brady*." In so doing, the trial court may have overlooked potential impeachment material contained in

---

[7] Whether the suppressed evidence would have been admissible at trial may be relevant to the materiality prong of *Brady* in the context of appellate review. (See, e.g., *Salazar*, *supra*, 35 Cal.4th. at p. 1043 [noting that "[m]ateriality, in turn, requires more than a showing that the suppressed evidence would have been admissible. . ."].) But the United States Supreme Court has not "establish[ed] that inadmissible evidence can never be material for purpose of a *Brady* claim." (*Miranda*, *supra*, 43 Cal.4th at p. 576.) Because we decide that the information contained in the redacted portions of the memoranda—even if admissible—was not material under *Brady*, we do not address this aspect of the *Brady* analysis.

25

the redacted memoranda concerning Dr. Jorden's performance of her duties as the forensic pathologist in other investigations. (See *Salazar*, *supra*, 35 Cal.4th. at p. 1052, fn. 8 [noting that due to the fact-specific nature of the inquiry under *Brady*, "it is rarely possible to predetermine whether particular information in any individual case will be material"].)

Because the second component under *Brady* (whether the evidence was "suppressed" by the government (*Strickler*, *supra*, 527 U.S. at p. 282)) is not at issue in this appeal, we turn to the third component. The prosecution's disclosure of the heavily redacted memoranda, and the trial court's denial of Deleoz's motion under *Brady* to order further disclosure, amounts to a constitutional violation "only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." (*Bagley*, *supra*, 473 U.S. at p. 678.)

In *Salazar*, the California Supreme Court observed that impeachment evidence generally " 'has been found to be material where the witness at issue "supplied the only evidence linking the defendant(s) to the crime" ' " (*Salazar*, *supra*, 35 Cal.4th at p. 1050), or " 'where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case.' " (*Ibid.*) There, the court decided that "even successful impeachment of Dr. Ribe's testimony would not have materially affected the jury's assessment of petitioner's guilt" based on other evidence establishing Salazar's guilt (*id.* at p. 1051) and because the "theory that Dr. Ribe shape[d] his testimony to fit the prosecution's case [wa]s neither the inevitable nor the most logical inference from the follow-up investigation report." (*Ibid.*)

We recognize that Dr. Jorden's testimony in this matter, opining that Lee's injuries could not have resulted from a mere accidental fall, supplied " 'a critical element of the prosecution's case.' " (*Salazar*, *supra*, 35 Cal.4th at p. 1050.) To that end, viewed through the lens of the prosecutor's disclosure obligations, we reiterate a well-worn point—that where materiality may have been in doubt prior to trial, " ' "the prudent

prosecutor will resolve doubtful questions in favor of disclosure." ' " (*Miranda*, *supra*, 43 Cal.4th at p. 577.) However, viewed through the posttrial lens of the appellate court after in camera review of the evidence in question, and considering the collective evidence presented at trial (*Brown*, *supra*, 17 Cal.4th at p. 887) and the jury's verdict, we conclude the third component of *Brady* is not met.

Deleoz was charged with murder. Yet the jury ultimately convicted Deleoz of the lesser offense of involuntary manslaughter (rather than first- or second-degree murder (§ 187), which would have required a finding of malice aforethought). This verdict strongly suggests the jury did not credit Dr. Jorden's opinion that Deleoz beat Lee to death.

The jury's conviction on a theory of involuntary manslaughter indicates that it found the evidence supported commission of a crime akin to that presented by Deleoz at closing argument. In argument, defense counsel contended that what had occurred was a "tragic accident." However, if the jury nevertheless believed Deleoz was criminally to blame for the fall he and Lee had in the apartment, it could convict him of involuntary manslaughter. The jury's verdict of involuntary manslaughter suggests they agreed with this characterization of the facts and rejected Dr. Jorden's contrary opinion.

Given that the defense effectively utilized at trial that portion of impeachment evidence concerning Dr. Jorden's alleged bias which had been disclosed to it prior to trial, we decide the disclosure of any further impeachment evidence contained in the redacted portions of the memoranda—beyond that which the defense had already utilized—would not have had any material effect on the outcome. (See *Strickler*, *supra*, 527 U.S. at p. 280; *Turner*, *supra*, 582 U.S. at p. __ [137 S.Ct. at p. 1895]; *Cordova*, *supra*, 62 Cal.4th at p. 124.) Under these circumstances, the nondisclosure of the redacted memoranda material does not " 'undermine[] confidence in the outcome of the trial.' " (*Kyles*, *supra*, 514 U.S. at p. 434).

27

In reaching this conclusion, we have considered the effect of the nondisclosure on the defense's investigations and trial strategies. (*Williams*, *supra*, 58 Cal.4th at p. 256.) While Deleoz may have sought to use the additional, nondisclosed impeachment evidence to bolster his theory about Dr. Jorden's purported tendency to rush to judgment regarding cause and manner of death, despite ambiguities in the evidence, we are unable to identify any aspect of the nondisclosed material that would have afforded the defense a new avenue for investigation or a different strategy at trial. We decide that, given the impeachment evidence that was disclosed and the particular trial outcome in this case, Deleoz has failed to establish the materiality of the nondisclosed impeachment evidence under *Brady*.

## B. Abstract of Judgment

The parties agree that there is an error in the abstract of judgment. The jury found Deleoz guilty of involuntary manslaughter under section 192, subdivision (b). However, the abstract of judgment lists the crime of conviction as involuntary manslaughter under section "929b)."

We agree that the reference to section "929b)" in lieu of "192(b)" is best characterized as a typographical error. As a typographical error is clerical in nature and correctable at any time, we will order the trial court to issue an amended abstract of judgment to correct the error. (See *In re Candelario* (1970) 3 Cal.3d 702, 705; cf. *People v. Kim* (2012) 212 Cal.App.4th 117, 123–124.)

## III. DISPOSITION

The judgment is affirmed. The trial court shall prepare and file an amended abstract of judgment to correct the statute of conviction to Penal Code section 192, subdivision (b).

_____
                    Danner, J.

WE CONCUR:

_____
Bamattre-Manoukian, Acting P.J.

_____
Lie, J.

**H047775**
***People v. Deleoz***

Trial Court:  County of Santa Clara

Trial Judge:  Hon. Eric S. Geffon

Counsel:  David W. Beaudreau, by appointment of the Court of Appeal under the Sixth District Appellate Program, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Seth K. Schalit, Supervising Deputy Attorney General and Catherine A. Rivlin, Supervising Deputy Attorney General, for Plaintiff and Respondent.

**H047775**
*People v. Deleoz*